EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Equipo Sanjuaneras de la Capital, representado por su apoderado Sr. Marcos M. Martínez<br><br>Peticionario<br><br>v.<br><br>Federación Puertorriqueña de Voleibol, representada por su Presidente, Dr. Cesar Trabanco y otros<br><br>Recurrido | 2021 TSPR 143<br><br>208 DPR \_\_\_\_ |

Número del Caso: CT-2021-13

Fecha: 19 de octubre de 2021

**Abogados de la parte peticionaria:**

    Lcda. Tatiana Vallescorbo Cuevas
    Lcdo. Dennis Seilhamer Anadon

Materia: Resolución del Tribunal con Voto particular de conformidad y Votos particulares disidentes.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Equipo Sanjuaneras de la Capital, representado por su Apoderado Sr. Marcos M. Martínez

    Peticionario

      v.

Federación Puertorriqueña de Voleibol, representada por su Presidente, Dr. Cesar Trabanco y otros

    Recurridos

CT-2021-0013

*Certificación Intrajurisdiccional*

*RESOLUCIÓN*

En San Juan, Puerto Rico, a 19 de octubre de 2021.

Examinada la *Urgente petición de auto certificación intrajurisdiccional* que presentó la parte peticionaria, se provee no ha lugar.

Notifíquese inmediatamente.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió un voto particular de conformidad al que se unen los Jueces Asociados señores Rivera García y Feliberti Cintrón. La Jueza Asociada señora Pabón Charneco está conforme y hace constar las expresiones siguientes, a las que se une el Juez Asociado señor Rivera García:

> "De forma excepcional, el recurso de certificación intrajurisdiccional permite elevar inmediatamente ante nuestra consideración asuntos pendientes en los foros inferiores que requieren una urgente solución. Consistentemente he favorecido certificar aquellos casos que requieran preterir este trámite procesal. Sin embargo, tras examinar el expediente del recurso presentado con sumo detenimiento, considero que este debe continuar el trámite ordinario. Así,

luego de considerado el caso por el foro apelativo intermedio y de su determinación ser desfavorable para la parte, esta contará con la oportunidad de presentar su caso ante este Tribunal".

La Jueza Presidenta Oronoz Rodríguez emitió un voto particular disidente. El Juez Asociado señor Colón Pérez emitió un voto particular disidente. El Juez Asociado señor Estrella Martínez disiente y hace constar las expresiones siguientes:

"El recurso de certificación, aunque de naturaleza excepcional, no debería restringirse en la práctica a casos de Derecho Electoral. Existen otras controversias de alto interés público en otras esferas de nuestra sociedad que justifican nuestra intervención oportuna. Precisamente, la certificación solicitada por el equipo Sanjuaneras de la Capital nos brindaba la oportunidad de considerar una controversia novel en Derecho cuya génesis fue el embarazo de alto riesgo de la jugadora refuerzo Destinee Hooker-Washington. Se trata, no sólo de una disputa nunca antes atendida en este Foro, sino también de un evento que desató un debate sobre el choque entre reclamos de derechos constitucionales y la autonomía deportiva. Esas consideraciones, por sí solas, están enmarcadas en un alto interés público que amerita nuestra intervención, pero, por demás, controversias de esta índole han logrado eludir por décadas el ámbito judicial. En esta ocasión, urgía que delimitáramos los linderos entre la autonomía deportiva y la capacidad del Poder Judicial para revisar actuaciones de los organismos deportivos reguladores. Máxime, cuando el suceso que desembocó en la controversia ante nos está rodeado de cuestionamientos en torno a la inobservancia de garantías constitucionales. En fin, consecuente con mi postura de certificar casos de alto interés público, unido a los planteamientos constitucionales y la onerosidad atada al trámite de revisión ante los organismos deportivos, hubiera certificado la controversia y atendido el caso en sus méritos. Por estas razones, disiento".

Javier O. Sepúlveda Rodríguez<br>
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Equipo Sanjuaneras de la
Capital, representado por
su Apoderado Sr. Marcos M.
Martínez

     Peticionario

         v.

Federación Puertorriqueña
de Voleibol, representada
por su Presidente Dr. César
Trabanco y otros
     Recurrido

CT-2021-0013

Voto particular de conformidad emitido por el Juez Asociado señor MARTÍNEZ TORRES al cual se unieron los Jueces Asociados señor RIVERA GARCÍA y señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 19 de octubre de 2021.

Estoy conforme con proveer no ha lugar a la petición de certificación intrajurisdiccional que tenemos ante nuestra consideración.

Este caso trata sobre dos partes privadas que acordaron, conforme a derecho, ventilar todas sus controversias mediante un proceso arbitral. Una de las partes, luego de no salir favorecida en el proceso arbitral, presentó un recurso en los foros judiciales, pretiriendo el procedimiento de arbitraje acordado entre las partes. Como veremos a continuación, basta leer y entender los conceptos básicos de arbitraje y de derecho apelativo para

concluir que el caso fue bien resuelto por el foro primario y no cumple con los requisitos para certificarlo, abortando así trámite ordinario.

I

El equipo Sanjuaneras de la Capital (Sanjuaneras) debía participar de la serie final de voleibol. Sin embargo, el equipo, a través de su apoderado, el Sr. Marcos M. Martínez, cursó una notificación al director del torneo de la Liga Superior Femenina de la Federación Puertorriqueña de Voleibol (Federación), para sustituir a una jugadora por un embarazo de alto riesgo. El director del torneo declaró "No Ha Lugar" la sustitución. El apoderado solicitó una reconsideración que se declaró "No Ha Lugar". Inconforme, el apoderado apeló la determinación ante el Presidente de la Federación, quien determinó "No Ha Lugar". Luego, el apoderado presentó una *Moción en Auxilio de Jurisdicción; Apelación y Solicitud de Vista Argumentativa* ante el Tribunal Apelativo y de Arbitraje Deportivo del Comité Olímpico. Ese mismo día los árbitros declararon "No Ha Lugar" el escrito. Sentencia del TPI, pág. 19.

Por eso, el apoderado le notificó a la Federación que el equipo no se presentaría a la serie final. Como consecuencia, la Federación canceló la serie final de la temporada 2021 y proclamó a las Criollas de Caguas como las campeonas del torneo. Tras esa determinación, el equipo de las Sanjuaneras, por conducto de su apoderado,

presentó una Demanda contra la Federación y el Comité Olímpico de Puerto Rico (COPUR). Entre otras cosas, solicitaron al foro primario que declarara que la determinación de la Federación no se ajustaba a una interpretación lógica de lo que constituyen lesiones incapacitantes, por lo que debía autorizar la sustitución. Además, solicitaron que se revirtiera la cancelación de la serie final y la proclamación de las Criollas de Caguas como campeonas del torneo.

Al evaluar la controversia de referencia, el Tribunal de Primera Instancia concluyó que estaba "impedido de intervenir en el asunto y quien tiene jurisdicción, según lo acordaron las partes, es la CAS [*Court of Arbitration of Sports*]". Véase: Sentencia del TPI, pág. 26. Añadió que "ya que existe un organismo adjudicativo independiente para la solución de disputas relacionadas con el incumplimiento de las constituciones, reglamentos o procedimientos de las federaciones afiliadas, a cuya autoridad el demandante se sometió contractualmente, es la CAS quien tiene la jurisdicción exclusiva para dilucidar las controversias trabadas entre el COPUR y la Federación". Íd. Al no prevalecer en el foro primario y pendiente una reconsideración ante ese foro, la parte peticionaria presentó ante nos un recurso de certificación intrajurisdiccional.

## II

La certificación intrajurisdiccional es un mecanismo procesal discrecional, que podemos expedir por iniciativa propia o a solicitud de parte, para elevar inmediatamente a la consideración de este Tribunal cualquier asunto pendiente ante los foros inferiores cuando existe conflicto entre decisiones previas del foro intermedio, o se plantean cuestiones noveles de derecho o de alto interés público que incluyen un asunto constitucional sustancial al amparo de la Constitución de Puerto Rico o de Estados Unidos. Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V; Art. 3.002 de la Ley Núm. 201-2003, 4 LPRA sec. 24s(f), conocida como la Ley de la Judicatura de Puerto Rico de 2003. Véase, además: Senado de PR v. ELA, 203 DPR 62, 69 (2019). La controversia de referencia no cumple con ninguno de estos criterios.

En primer lugar, no estamos ante decisiones conflictivas del foro intermedio. Segundo, distinto a lo planteado por la parte demandante-peticionaria, la controversia es jurisdiccional. ¿Puede una parte preterir el procedimiento arbitral acordado contractualmente? Evidentemente no estamos ante un asunto novel de derecho. Está resuelto que "una vez acordado el arbitraje, los tribunales carecen de discreción respecto a su eficacia y tienen que dar cumplimiento al arbitraje acordado". VDE Corporation v. F & R Contractors, 180 DPR 1, 36 (2010). Los foros de jerarquía inferior están más que capacitados

para atender la controversia y resolverla conforme a derecho.

Por último, no nos encontramos ante una controversia de alto interés público **de carácter constitucional sustancial que pueda evadir nuestro pronunciamiento.** Al respecto, hay que tener claro que el trato a las jugadoras no es lo que nos ocupa. La controversia ante nuestra consideración es sobre la primacía de un pacto de arbitraje entre partes privadas: la Federación y el equipo Sanjuaneras. Por esa razón, tampoco hay acción estatal que active la cláusula de igual protección de las leyes. Para que proceda plantear judicialmente una alegada violación a un derecho constitucional, de ordinario, es necesario que haya mediado una actuación del Estado. González v. Hospital Pavía, 168 DPR 127 (2006). "El proceso debido en virtud de un contrato no es el debido proceso de ley garantizado constitucionalmente y cuyo quebrantamiento implica violación a derechos fundamentales." Íd. pág. 36. Por lo tanto, no basta que la controversia haya generado un alto interés entre los ciudadanos. Si esta no está revestida de implicaciones constitucionales sustanciales no podemos verla mediante el procedimiento extraordinario de certificación.

Como vemos, el recurso de referencia no cumple con ninguno de los criterios por los que debamos abortar el procedimiento ordinario. La única controversia que tenemos ante nuestra consideración es si las partes podían usar un

*injunction* para preterir el proceso de arbitraje ante el CAS. El Tribunal de Apelaciones está capacitado para atender la controversia y resolver conforme a derecho, si así se le solicita. Para eso existe y, por respeto institucional, no podemos tratar a ese foro como si no sirviera para nada. Si la parte aquí peticionaria no está conforme con la determinación del foro primario tiene a su disposición los procedimientos de revisión que proveen nuestras Reglas de Procedimiento Civil. Por lo tanto, si en su momento este asunto llega ante nosotros, la controversia no evadirá nuestra atención.

Por último, me veo en la obligación de expresar que nuestra función institucional es resolver casos y controversias que cumplan con las normas de justiciabilidad y las reglas apelativas. En ausencia de un caso o controversia justiciable, no tenemos autoridad para decirle al directivo de una empresa o asociación cómo administrarla. ¡Zapatero a su zapato!


                              RAFAEL L. MARTÍNEZ TORRES
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Equipo Sanjuaneras de la Capital, representado por su Apoderado Sr. Marcos M. Martínez

    Peticionario

    v.

Federación Puertorriqueña de Voleibol, representada por su Presidente, Dr. Cesar Trabanco y otros

    Recurridos

CT-2021-0013


La Jueza Presidenta ORONOZ RODRÍGUEZ emitió un Voto particular disidente


> *"[R]epensar el derecho y su función social, es un desafío que va más allá de contar con "buenas leyes" o con "buenas resoluciones judiciales" para las mujeres. Significa hacer de esta disciplina un instrumento transformador que desplace los actuales modelos sexuales, sociales, económicos y políticos hacia una convivencia humana basada en la aceptación de la otra persona como una legítima otra y en la colaboración como resultante de dicho respeto a la diversidad"[1]*

En San Juan, Puerto Rico, a 19 de octubre de 2021.

Los derechos logrados por los movimientos del pasado y la universalización de los derechos humanos proveniente del reconocimiento de la dignidad

---

[1] Alda Facio & Lorena Fries, *Feminismo, género y patriarcado*, 3 ACADEMIA REVISTA SOBRE ENSEÑANZA DEL DERECHO DE BUENOS AIRES 259, 280 (2005), http://repositorio.ciem.ucr.ac.cr/jspui/handle/123456789/122.

inherente a todas las personas, han propiciado que hoy las niñas y las mujeres subviertan los estereotipos de género tradicionales. Asimismo, tales derechos propulsan el avance en el ejercicio de sus libertades más allá de las expectativas culturales que se les han impuesto. Así, contra viento y marea, las mujeres se han insertado a espacios de la sociedad que antes les eran vedados por considerarse reservados o privilegiados para los hombres. Al incorporarse en disciplinas como el deporte, muestran que cuentan con las mismas capacidades y destrezas que los varones. Sin embargo, como en todos los ámbitos de la vida, las mujeres siguen enfrentando dificultades y la desigualdad es una constante que hay que combatir.

Históricamente las mujeres han sido discriminadas en sus espacios laborales por embarazarse y el mundo deportivo no ha sido la excepción. Es un hecho que en el deporte la discriminación contra la mujer y la penalización por maternidad es una problemática que enfrentan muchas deportistas profesionales en Puerto Rico y alrededor del mundo. En este caso, se cuestionaba si no autorizar la sustitución de una jugadora en la serie postemporada por tener un embarazo de alto riesgo, constituyó una interpretación errónea y discriminatoria de lo que constituye una lesión que le incapacita para participar en los juegos de voleibol femenino. Dicha controversia se exacerba ante el hecho de que se da en el contexto de la actuación de una organización deportiva privada que invoca

la autonomía deportiva.

Es lamentable que, a pesar de que en este caso se levantan cuestionamientos jurídicos de tangencia constitucional que impactan el deporte puertorriqueño y, en particular, los derechos de las mujeres atletas, declinemos intervenir. Ello se aparta de expresiones pasadas en la que reconocimos que las reclamaciones de discrimen por razón de género, incluyendo las que se generan a raíz de la condición de embarazo, están revestidas de un alto interés público. Hoy el mensaje es otro: suena a que no hay problema con esperar a ver si más tarde en el camino alguien decide traerlo ante la consideración de otros foros o en una segunda vuelta, ante este Tribunal. En ese vaivén, permitimos que se evada la revisión judicial de asuntos tales como si: 1) el Tribunal General de Justicia de Puerto Rico tiene jurisdicción para atender casos donde se levante la autonomía deportiva; 2) si se violó el debido proceso de ley contractual y si fue discriminatorio no proveerle al Equipo de las Sanjuaneras un facultativo médico que determinara si un embarazo de alto riesgo es una lesión a los fines de la aplicar la excepción de sustitución al amparo del Reglamento de la Liga; y 3) si la peticionaria no venía obligada a recurrir a la Corte de Arbitraje Deportivo sita en Suiza por tratarse de una controversia sobre una violación de las políticas de discrimen. Además, era imperativo aclarar en nuestro ordenamiento si el debido proceso de ley y, en concreto, el principio de igualdad,

condiciona las relaciones entre el poder del Estado y el individuo y, a su vez, es una garantía que irradia plenamente a las relaciones entre particulares, pues allí también está presente la fuerza vinculante de la Constitución como un escudo para la persona frente a la arbitrariedad.

Ante estas controversias, el Tribunal debió certificar el caso para evaluar si la intervención en materia de jurisdicción y de interpretación constitucional era procedente y si había cabida para un estudio a fondo, determinar si los derechos fundamentales a la dignidad humana, a la igualdad y a la no discriminación por razón de género debían protegerse. Por haber rehusado ejercer su función judicial, disiento.

I

El Equipo de las Sanjuaneras de la Capital, representado por su Apoderado el Sr. Marcos M. Martínez presentó ante este Tribunal una *Urgente petición de auto certificación intrajurisdiccional*. En primer lugar, solicitó que determinemos que el Tribunal General de Justicia de Puerto Rico tiene jurisdicción para atender casos donde se levante la autonomía deportiva. En segundo lugar, requirió que establezcamos si se violó el debido proceso de ley contractual y si fue discriminatorio no proveerle al Equipo de las Sanjuaneras un facultativo médico que determinara si un embarazo de alto riesgo es una lesión a los fines de la aplicar la excepción de

sustitución al amparo del Reglamento de la Liga. En tercer lugar, pidió que concluyamos que la peticionaria no venía obligada a recurrir a la Corte de Arbitraje Deportivo localizada en Suiza por tratarse de una controversia sobre una violación de las políticas de discrimen. En cuarto lugar, solicitó que declaremos nula la suspensión por un año de todos los miembros del Equipo de las Sanjuaneras que impuso la Federación Puertorriqueña de Voleibol sin la celebración de la vista compulsoria que exige el Reglamento de la Liga. Por último, pidió que se declare nulo el campeonato de las Criollas de Caguas y que revoquemos la Sentencia del Tribunal de Primera Instancia.

En su solicitud de certificación la parte peticionaria señaló que el caso se encontraba pendiente ante el Tribunal de Primera Instancia. En particular, informó que había presentado una Solicitud de Reconsideración que el foro primario no había resuelto. Posteriormente, el mismo día de la presentación del recurso, con hora distinta, la parte peticionara presentó una Moción Informativa donde nos comunicó que el Tribunal de Primera Instancia notificó la denegatoria de la moción de reconsideración.

En síntesis, los hechos que dieron origen a este caso controversia son los siguientes. El Equipo Sanjuaneras de la Capital tenían que participar en la temporada final que de voleibol el 4 de septiembre de 2021 organizada por la

Federación Puertorriqueña de Voleibol.[2] Asimismo, una jugadora de las Sanjuaneras, Destinee Hooker-Washington, informó que estaba en estado de embarazo y que el mismo era uno de alto riesgo. En consecuencia, el Equipo Sanjuaneras de la Capital, por conducto de su apoderado, notificó al Lcdo. José Servera, director de torneo de la Liga Superior Femenina de la Federación Puertorriqueña de Voleibol, su intención de sustituir a su jugadora refuerzo su situación de salud. El Director de Torneo declaró "No Ha Lugar" la solicitud de sustitución mediante Resolución, por lo que el 1 de septiembre el Equipo solicitó Reconsideración donde expuso la incapacidad de la jugadora para participar de la serie final. Anejó un Certificado Médico donde acreditó que la atleta tenía un embarazo de alto riesgo por lo que no podía participar de la Serie Final sin exponer su salud. Con ello ante su consideración, el licenciado Servera declaró "No Ha Lugar" la Reconsideración presentada. Ese mismo día, el apoderado de las Sanjuaneras de la Capital apeló la determinación ante el Presidente de la FPV, el Dr. Cesar Trabanco. El Presidente de la FPV determinó "No Ha Lugar" por lo que el 2 de septiembre de 2021, el señor Martínez, presentó Moción en Auxilio de Jurisdicción; Apelación y Solicitud de Vista Argumentativa para el 3 de septiembre de 2021, ante el Tribunal Apelativo y de Arbitraje Deportivo del Comité Olímpico (TAAD). TAAD emitió

---

[2] Compareció Metro V.C., LLC que se encuentra reconocido por la FPV como "Equipo Sanjuaneras de la Capital".

una Resolución de "No Ha Lugar".

Posteriormente, el 6 de septiembre de 2021, el Equipo Sanjuaneras de la Capital, por conducto de su apoderado, presentó una Demanda enmendada contra la FPV y el Comité Olímpico de Puerto Rico (COPUR) ante el Tribunal de Primera Instancia (TPI). Ante el foro primario el equipo argumentó que el hecho de no autorizar la sustitución de la jugadora de refuerzo en la serie postemporada por tener un embarazo del alto riesgo, certificado por un galeno, se basó en una interpretación errónea de lo que constituye una lesión en los juegos de voleibol femenino. Solicitaron que concluyese que la FPV no actuó conforme a su reglamento por no designar a un médico que confirmase el embarazo de alto riesgo de la jugadora, según lo dispuesto en el Reglamento de la Liga, y, por consiguiente, se legitimó el discrimen contra una atleta embarazada en contravención a la Constitución del COPUR. Además, solicitaron que se restituya la serie final y se declare nula la declaración del equipo de las Criollas de Caguas como campeonas del torneo. Luego de varios trámites procesales y comparecencias, el TPI desestimó el caso por falta de jurisdicción y concluyó que el CAS es el organismo adjudicativo independiente al cual el Equipo Sanjuaneras de la Capital se sometió contractualmente.

II

A. Mecanismo de certificación intrajurisdiccional

La Mayoría se equivoca al concluir que no estamos ante un caso que amerite nuestra pronta intervención judicial. El mecanismo de certificación intrajurisdiccional hubiera permitido determinar si teníamos o no jurisdicción y, de concluir que la teníamos, considerar si hubo o no un trato discriminatorio al amparo de nuestra Constitución. Los siguientes fundamentos autorizaban y aconsejaban certificar la *Urgente petición de auto certificación intrajurisdiccional*.

El Art. 3.002(f) de la Ley de la Judicatura de 2003, Ley Núm. 201-2003, 4 LPRA sec. 24s, establece que:

> Mediante auto de certificación, a ser expedido discrecionalmente, motu proprio o a solicitud de parte, [el Tribunal Supremo] podrá traer inmediatamente ante sí para considerar y resolver cualquier asunto pendiente ante el Tribunal de Primera Instancia cuando se plantee la existencia de un conflicto entre decisiones previas del Tribunal de Apelaciones, **se planteen cuestiones noveles de derecho, o se planteen cuestiones de alto interés público que incluyan cualquier cuestión constitucional sustancial al amparo de la Constitución de Puerto Rico o de la Constitución de Estados Unidos.** (Énfasis suplido). Véase, además, Regla 52.2(d) de Procedimiento Civil, 32 LPRA Ap. V.

Anteriormente, hemos expresado que "[s]e puede afirmar que el auto de certificación es un recurso que la ciudadanía tiene a su alcance para tener acceso a la justicia en casos de alto interés público" Alvarado Pacheco Y Otros v. E.L.A., 188 DPR 594, 617 (2013). Igualmente, enunciamos que la expedición del recurso de certificación intrajurisdiccional autoriza que este Tribunal atienda

controversias que puedan evadir nuestro pronunciamiento.
Alvarado Pacheco y otros v. ELA, *supra*, pág. 623.

Cabe destacar que el recurso de certificación intrajurisdiccional es uno de naturaleza excepcional ante la política pública del ordenamiento jurídico de esperar a que los casos maduren por medio del trámite ordinario para impedir que este foro lo atienda a destiempo. Alvarado Pacheco y otros v. ELA, *supra*; U.P.R. v. Laborde Torres y otros I, 180 DPR 253 (2010); Rivera v. J.C.A., *supra.* No obstante, ya hemos resuelto que:

> El mecanismo de certificación cumple el propósito de adelantar el trámite judicial ordinario para que este Tribunal atienda cuestiones que por su gran importancia y envergadura ameritan ser resueltas prontamente. Rivera v. J.C.A., 164 D.P.R. 1 (2005); Suárez v. C.E.E. I, 163 D.P.R. 347 (2004). Nótese que sólo basta con que el caso esté pendiente ante el tribunal de instancia para que se nos pueda presentar la controversia mediante este recurso. Incluso, motu proprio, podemos traer inmediatamente la controversia ante nosotros para considerarla y resolverla. En fin, **la existencia del recurso de certificación elimina prácticamente la posibilidad de que este tipo de casos evada nuestro pronunciamiento sobre el asunto.** Presidente de la Cámara v. Gobernador, 167 DPR 149, 160-161 (2006) (Énfasis suplido).

El presente caso cumple con los criterios necesarios para ser certificado por ser uno novel y de carácter constitucional. Al momento de ejercer nuestra discreción de evaluar una certificación intrajurisdiccional, debemos considerar los siguientes factores: "(1) la urgencia, (2) la etapa en que se encuentran los procedimientos, (3) la necesidad que puede presentarse de recibir prueba y (4) la complejidad de la controversia". Pueblo v. Santiago Cruz,

205 DPR 7, 61 (2020) citando a <u>Rivera Schatz v. ELA y C. Abo. PR II</u>, 191 DPR 791, 849 (2014).

Estamos ante una controversia de alto interés público que puede evadir nuestros pronunciamientos. La última ocasión en la que nos expresamos sobre prácticas arbitrarias y discriminatorias en eventos federativos fue hace aproximadamente cuarenta y seis años, en <u>Peña v. Federación de Esgrima de P.R.</u>, 108 DPR 147 (1978). En esta ocasión, se le escapa al Tribunal la ocasión para realizar una expresión sobre el alcance de la autonomía deportiva en la revisión judicial a pesar de que ello es un asunto novel y de importancia vital para el deporte puertorriqueño.

Específicamente, se trata de una controversia compleja que requería la intervención de este foro para dictaminar cuál sería la norma que regiría el alcance de nuestra jurisdicción ante controversias de autonomía deportiva *vis á vis* el debido proceso de ley privado y su impacto ante reclamaciones de discrimen de mujeres atletas embarazadas.

Adicional al elemento novel, este caso atañe a cuestiones de alto interés público de carácter constitucional sustancial al amparo de la Constitución de Puerto Rico. Recordemos que "[e]n Puerto Rico **las reclamaciones de discrimen por condición de género, incluyendo aquel que se genera a raíz de la condición de embarazo, están revestidas de un alto interés público**". <u>Santiago, González v. Mun. de San Juan,</u> 177 DPR 43, 55 (2009) (énfasis suplido).

La controversia de autos se encuentra cobijada por el más alto interés público porque estamos ante un cuestionamiento de discrimen e implica una posible violación al principio constitucional que exige la igual protección de las leyes para todas las personas. Como sabemos, el principio fundamental sobre la inviolabilidad de la dignidad humana impone como consecuencia necesaria el trato igualitario ante la ley. Const. P.R., Art. II, Sec. 1, LPRA, Tomo 1. Asimismo, el recurso se encuentra en una etapa de fácil disposición y se tenía que resolver de forma urgente debido a la posibilidad de que se cree un precedente aciago para la protección de los derechos constitucionales de las mujeres atletas de Puerto Rico.

Al mismo tiempo, la presente controversia es de estricta hermenéutica constitucional e *iusprivatista*.[3] Es decir, se nos presenta un asunto de derecho que se puede resolver sin la necesidad de evaluar prueba. Es nuestro deber determinar de una vez y por todas si la autonomía deportiva —en el caso específico donde unas partes contractualmente pactan acudir al CAS sito en Suiza— impide que el Tribunal General de Justicia tenga jurisdicción para atender el caso controversia. Sobre todo, cuando se plantea que no adjudicar la controversia implicaría confirmar un acto de discrimen contra una atleta embarazada.

Por otra parte, aunque en el pasado dijimos que "una

---

[3] *Véase* J. Farinacci Fernós*, Hermenéutica Puertorriqueña. Cánones de Interpretación Jurídica*, Interjuris, 2019.

vez acordado el arbitraje, los tribunales carecen de discreción respecto a su eficacia y tienen que dar cumplimiento al arbitraje acordado", dichas expresiones se realizaron en una disputa entre contratistas dedicados a la construcción de viviendas y no en controversias sobre discrimen por embarazo. VDE Corporation v. F&R Contractors, 180 DPR 1, 36 (2010). Además, aun para tales disputas existen excepciones al arbitraje entre las partes: "en aquellos escenarios en que una unión falta a su deber de proveer a sus representados justa representación, […]; cuando recurrir al arbitraje constituya un gesto fútil y vacío […] y en reclamaciones por hostigamiento sexual al amparo de la Ley Núm. 17 de 22 de abril de 1988 (29 L.P.R.A. sec. 155 et seq.) (Ley Núm. 17). Quiñones v. Asociación, 161 DPR 668, 673, 2004 TSPR 58 (2004). Asimismo, hemos preterido el proceso de arbitraje en casos donde "(1) se trate de una acción por despido discriminatorio y (2) que las partes hayan acordado que sus disputas se resolverían exclusivamente ante un árbitro del Negociado". Íd. pág. 674.

Definitivamente, un organismo independiente sito en Suiza carece de la capacidad para atender controversias donde se plantea discrimen por razón de embarazo o si la FPV o el COPUR es o no un actor del Estado. Después de todo, la prudencia de abstención judicial ante cláusulas de arbitraje no nos puede convertir en jueces sonámbulos sin consciencia del contexto y del desarrollo jurídico de las

instituciones de nuestro país. El juez sonámbulo que, al aplicar mecánicamente la ley, sin tomar las particularidades de cada caso siempre "camina por terreno minado". Trías Monge, *Teoría de la Adjudicación*, Ed. UPR, San Juan, 2000, pág. 3.

B. Adjudicación con perspectiva de género

"Todos los seres humanos nacen libres e iguales en dignidad y derechos y, dotados como están de razón y conciencia, deben comportarse fraternalmente los unos con los otros." Artículo 1 de la Declaración Universal de los Derechos Humanos. El equivalente a dicha máxima en nuestra Constitución se encuentra en la Sección 1, Artículo II, que dispone que "[l]a dignidad del ser humano es inviolable." Const. PR, Art. II, Sec. 1, LPRA, Tomo 1.

De allí la necesidad de examinar las controversias en consideración con la perspectiva de género. Desde 1997, el Consejo Económico y Social de las Naciones Unidas explicó que la perspectiva de género es:

> **[e]l proceso de evaluación de las consecuencias para las mujeres y los hombres de cualquier actividad planificada, inclusive las leyes, políticas o programas, en todos los sectores y a todos los niveles.** Es una estrategia destinada a hacer que las preocupaciones y experiencias de las mujeres, así como de los hombres, sean un elemento integrante de la elaboración, la aplicación, la supervisión y la evaluación de las políticas y los programas en todas las esferas políticas, económicas y sociales, **a fin de que las mujeres y los hombres se beneficien por igual y se impida que se perpetúe la desigualdad. El objetivo final es lograr la igualdad [sustantiva] entre los géneros.** Oficina del Asesor Especial en Cuestiones de Género y Adelanto de la Mujer, *La*

*incorporación de la perspectiva de género*, pág. 2 (2002).

Por su parte, juzgar con perspectiva de género puede definirse como una "metodología judicial de resolución del conflicto jurídico, contextualizada y conforme al principio pro persona en la búsqueda de soluciones justas ante situaciones desiguales de género. La diferencia sexual será jurídicamente relevante, cuando exista distinción, exclusión o restricción lesiva de género."[4] Según explica la Magistrada española Glòria Poyatos, "[h]acer real el principio de igualdad no permite neutralidad, hay que adoptar un enfoque constitucional, removiendo los obstáculos que lo dificulten, e integrando la perspectiva de género, como criterio de referencia en todos los casos que involucren relaciones asimétricas y patrones estereotípicos de género."[5]

En la misma línea, en base a las teorías de derecho y género, el otrora Juez Presidente, José Trías Monge explica que el derecho ha sido instrumento de opresión "a la par que campo de combate para que deje serlo". Trías Monge, supra, pág.338. Por mandato constitucional, este Tribunal tiene el deber de reivindicar el derecho a la dignidad humana y erradicar toda teoría que fomente la desigualdad

---

[4] Glòria Poyatos i Matas, Juzgar con Perspectiva de Género: Una Metodología Vinculante de Justicia Equitativa, 2 IQUAL. REV. DE GÉNERO E IGUALDAD [IQUAL.] 19 (2019) (España).
[5] Id.

jurídica entre los géneros.[6]

La perspectiva de género es de importancia vital para entender las distinciones de, por ejemplo, los equipos de voleibol que están compuestos solo por hombres y aquellos que están compuestos solo por mujeres. La máxima de igualdad es jurídica y no es --ni puede ser-- biológica, por lo que "las diferencias fisiológicas que se dan entre los sexos pueden justificar legítimamente en algunas situaciones concretas el trato diferencial de la mujer y el varón". Pueblo v. Rivera Morales, 133 DPR 444, 448 (1993).

Encasillar la controversia a una mera disputa contractual arbitral es invisibilizar la realidad de que se trata de un equipo compuesto, únicamente, por mujeres atletas con derecho a reproducirse. Es notable que, en este caso, fueron hombres quienes --desde sus esferas del poder gerencial que ostentan-- efectuaron una interpretación restrictiva sobre el concepto "lesión" en un reglamento de voleibol femenino con los consabidos potenciales efectos discriminatorios.

"Hay dos formas de impartir justicia, hacerlo formal y mecánicamente y hacerlo con equidad y perspectiva de género. La primera perpetúa las sistémicas asimetrías sociales entre sexos, la segunda, en cambio, camina hacia

---

[6] Véanse A. Colón Warren, *Asuntos de género en la discusión pública a través del siglo veinte en Puerto Rico*, 36 Rev. Jur. UIPR 401 (2002); Z.T. Dávila Roldán, *El Discrimen Interseccional: Contexto y Acercamiento a la Realidad Puertorriqueña*, 83 Rev. Jur. UPR 407 (2014); M.D. Fernós, *Ex Parte A.A.R.: Implicaciones para la Igual Protección de las Leyes,* 47 Rev. Jur. UIPR 231 (2013); L. Fiol Matta, *On Teaching Feminist Jurisprudence,* 57 Rev. Jur. UPR 253 (1988).

una sociedad (realmente) igualitaria."[7]

### III

A pesar de que este caso contaba con todos los criterios para certificarse, una Mayoría de este Tribunal declinó resolverlo. Con ello, perdió la oportunidad de dilucidar: (a) si las actuaciones de la Federación Puertorriqueña de Voleibol constituyen actos discriminatorios por razón de embarazo; y (b) si el Tribunal General de Justicia de Puerto Rico tiene jurisdicción para atender aquellos casos donde se levante la autonomía deportiva, entre otros.

Pero más allá, al decirle a la parte que viaje a través de dos foros, uno de instancia y otro apelativo, que si quiere luego regrese a nosotros, pero entre medio, o quizás antes, vaya a la Corte de Arbitraje Deportivo en Suiza, es igual que cerrarle la puerta en la cara. Las controversias sobre el discrimen por razón de embarazo no se despachan con frases provenientes de refraneros; estas se estudian y, cuando el ordenamiento lo aconseja como ocurre en este caso, se resuelven en los méritos -en una dirección o la otra- sin dilación ni regodeos. Disiento.

Maite D. Oronoz Rodríguez
Jueza Presidenta

---

[7] Poyatos, _supra,_ pág. 20.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Equipo Sanjuaneras de la Capital,
representado por su Apoderado
Sr. Marcos M. Martínez

    Peticionario

           v.

Federación Puertorriqueña de
Voleibol, representada por su
Presidente, Dr. César Trabanco
y otros

    Recurridos

CT-2021-013


Voto Particular Disidente emitido por el Juez Asociado señor COLÓN PÉREZ.


En San Juan, Puerto Rico a 19 de octubre de 2021.

> **El deporte tiene el poder de transformar el mundo. Tiene el poder de inspirar, de unir a la gente como pocas otras cosas. Tiene más capacidad que los gobiernos de derribar barreras raciales[, de derrumbar los vestigios del discrimen y de exaltar la dignidad humana].[1]**
>
> **Nelson Mandela**

Por entender que tenemos ante nuestra consideración noveles controversias que pudiesen incidir sobre el derecho a la dignidad del ser humano, consagrado en la Constitución del Estado Libre Asociado de Puerto Rico, el Juez que

---

[1] Nelson Mandela fue abogado, activista contra el Apartheid, político y filántropo sudafricano que presidió su País de 1994 al 1999. En el año 1993, recibió el Premio Nobel de la Paz.

suscribe hubiese certificado la causa de epígrafe.[2] Lo anterior, a los fines de que este Tribunal tuviese la oportunidad de decidir -- con la urgencia que lo ameritaba -- si debíamos rectificar, o no, el aparente trato discriminatorio y de ataque a la dignidad humana del que presuntamente fue víctima la joven voleibolista Destinee Hooker-Washington. Ello, a manos de la Federación Puertorriqueña de Voleibol y de su Presidente, el doctor César Trabanco, como consecuencia de ésta jugadora haber notificado su estado de embarazo; lo que a su vez generó la imposición de apresuradas y extremas sanciones al equipo de voleibol superior femenino las Sanjuaneras de la Capital.[3]

Y es que, a nuestro juicio, estamos ante un caso que nunca debió haber evadido la revisión judicial.[4] Eso es así,

---

[2] No nos cabe duda de que el presente caso poseía los requisitos necesarios para ser certificado por este Tribunal, toda vez que se trata aquí de controversias de alto interés público, que involucra cuestiones noveles de derecho, según lo requiere el Art. 3.002(f) de la Ley de la Judicatura de 2003, Ley Núm. 201-2003, 4 LPRA sec. 24s(f) y la Regla 52.2 de Procedimiento Civil, 32 LPRA Ap. V, R 52.2.

Sobre el particular, basta con señalar que esta Curia ha reconocido que en "Puerto Rico las reclamaciones de discrimen por condición de género, incluyendo aquel que se genera a raíz de la condición de embarazo, están revestidas de un alto interés público. Además, existe una clara política pública de condenar tales acciones discriminatorias". *Santiago León v. Municipio de San Juan*, 177 DPR 43, 55 (2009).

[3] Entre las referidas sanciones, se encuentran, la suspensión por un (1) año de todo el componente del equipo de las Sanjuaneras y la cancelación de la Serie Final de Voleibol Superior Femenino a celebrarse el pasado mes de septiembre entre el referido sexteto y las Criollas de Caguas.

[4] Al respecto, huelga señalar aquí que han sido variados los escenarios en los que, aún cuando exista una cláusula contractual de arbitraje convenida para la resolución de disputas entre las partes involucradas -- similar a como ocurre en el caso de autos --, este Foro ha pautado que la parte que alega determinada modalidad de discrimen podrá elegir presentar su causa de acción ante el foro de arbitraje pactado o ante los foros de justicia. *Quiñones v. Asociación*, 161 DPR 668, (2004); *Medina v. Cruz Azul de PR*, 155 DPR 735 (2001); *Vélez v. Serv. Legales de P.R., Inc.*, 144 DPR 673 (1998).

pues las acciones discriminatorias y de atropello a la dignidad humana en el ámbito deportivo -- de las cuales al parecer fue víctima Destinee Hooker-Washington, por razón de su embarazo --, de en su día probarse ante un Tribunal, deben ser sancionadas por ser contrarias a lo dispuesto en nuestra Carta Magna, inclusive en escenarios como éstos, en donde los actores principales son personas o entidades privadas.[5]

Si bien somos conscientes, como acabamos de señalar, que las controversias que originan el presente litigio se dan en el ámbito de personas particulares donde -- de ordinario -- no operan automáticamente las protecciones constitucionales que se tienen ante el Estado, igual de conscientes estamos de que -- de probarse lo que aquí se

---

Es decir, es norma reiterada que los foros judiciales tienen jurisdicción original en aquellas causas de acción donde una persona alega haber sido discriminada por diversas razones; así, por ejemplo, las disputas obrero-patronal donde un obrero u obrera denuncia haber sido discriminada por razón de edad, sexo, hostigamiento, entre otros. Véase, *Quiñones v. Asociación*, *supra*; *Medina v. Cruz Azul de PR*, *supra*, pág. 738 (Puede obviarse el arbitraje en una acción en la que un obrero u obrera reclame que su despido obedeció a una actuación discriminatoria del patrono por razón de edad o de sexo (embarazo), a la luz de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 LPRA sec. 149 *et seq.*); *Vélez v. Serv. Legales de P.R., Inc.*, *supra*, pág. 683 (La persona unionada que reclame ser víctima de hostigamiento sexual al amparo de la Ley Núm. 17 de 22 de abril de 1988, 29 LPRA sec. 155 *et seq.*, no estará obligada a agotar los procedimientos de arbitraje establecidos en el convenio colectivo antes de recurrir al foro judicial). Consecuentemente, en circunstancias como éstas, la intervención judicial no tiene y no debe esperar.

[5] Nos comenta el licenciado Jean René Santiago Cruz que la interpretación de los oficiales deportivos de que un embarazo de alto riesgo no cualifica como una lesión es un enfoque estrechamente legalista y carente de perspectiva de género a pesar de la apariencia neutral de la medida. Esto pues "[l]a interpretación supuestamente neutral de una regla se hace distendida de la realidad social de su aplicación, en este caso la realidad de las mujeres". Jean René Santiago Cruz, *Destinee Hooker-Washington: hace falta perspectiva de género en la Liga de Voleibol Superior Femenino*, El Nuevo Día, 5 de septiembre de 2021, https://www.elnuevodia.com/opinion/punto-de-vista/destinee-washington-hace-falta-perspectiva-de-genero-en-la-liga-de-voleibol-superior-femenino/#(última visita, 13 de octubre de 2021).

alega -- este pudo haber sido el escenario ideal para, tal como lo hicimos décadas atrás en lo relacionado al derecho a la intimidad, extender al ámbito de las relaciones privadas la protección constitucional a la dignidad humana.[6] **<u>Ésta vez como un derecho independiente</u>**. Adviértase que, la inviolabilidad de la dignidad humana debe ser protegida ante todos y todas. Véase, Art. II, Sec. 1, Const. ELA, LPRA, Tomo 1.

Al respecto, nos comenta el profesor Carlos Ramos González que la dignidad humana "pertenece a una misma especie donde cada uno de nosotros [y nosotras] la sostiene sin que pueda entregarse, renunciarse o negociarse sin afectar a los demás". Véase, C. Ramos González, *La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el Derecho constitucional puertorriqueño*, Vol. X, Rev. Acad. Puer. de Juris. y Leg., 1 (2010). Ésta última, es un valor inherente a la condición de ser persona que contempla el

---

[6] Sobre ello, precisa señalar aquí que esta Curia ha reconocido la aplicabilidad de ciertas disposiciones constitucionales a la esfera privada. En particular, en *Arroyo v. Rattan Specialist, Inc.*, 117 DPR 35, 64 (1986), reiteramos que el derecho a la intimidad opera *ex propio vigore* y se puede hacer valer ante personas privadas. **<u>También, -- y crucial para el asunto de epígrafe -- expresamos que "[a] igual conclusión tenemos que llegar en lo que respecta al derecho constitucional que propugna la inviolabilidad de la dignidad del ser humano y aquel que protege a todo trabajador contra riesgo a su integridad personal en el trabajo"</u>**. (Énfasis y subrayado suplido). *Íd.*, pág. 64.

Por otra parte, nos indica el profesor Farinacci Fernós que a medida que la inviolabilidad de la dignidad del ser humano está estrechamente relacionada con el derecho constitucional a la intimidad e integridad personal, el mismo no puede ser violentado por el Estado ni tampoco por particulares. J.M. Farinacci Fernós, *La Carta de Derechos, San Juan, 1ra ed., San Juan, Ed. Universidad Interamericana de Puerto Rico, 2021,* pág. 36.

respeto y trato adecuado que merece cada individuo. J.M. Farinacci Fernós, *La Carta de Derechos*, San Juan, 1ra ed., San Juan, Ed. Universidad Interamericana de Puerto Rico, 2021, pág. 29.

Específicamente, se desprende del Art. II, Sec. 1, de nuestra Constitución, *supra*, así como de la discusión habida entre los delegados de la Convención Constituyente, que el derecho a la inviolabilidad de la dignidad humana se incorporó con un propósito dual. Farinacci Fernós, *op. cit.*, pág. 31. **En primer lugar, para que fuese reconocido como fuente independiente de derecho con su propio contenido normativo.** *Íd.* En segundo lugar, para posicionarlo como la arquitectura ideológica de nuestra Carta de Derechos, ya que "[t]al vez toda ella está resumida en la primera oración de su primer postulado: la dignidad del ser humano es inviolable". 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico, págs. 1103 (ed. 1961); citado en Farinacci Fernós, *op. cit.*, pág. 31.[7]

---

[7] Sobre el particular, conviene repasar las expresiones del entonces Presidente de la Comisión de la Carta de Derechos, el delegado Benítez Rexach, en su turno para explicar el alcance de la Carta de Derechos a la Convención Constituyente:

Quiero ahora, brevemente, señalar la arquitectura ideológica dentro de la cual se monta esta proposición. Tal vez toda ella está resumida en la primera oración de su primer postulado: la dignidad del ser humano es inviolable. Esta es la piedra angular y básica de la democracia. En ella radica su profunda fuerza y vitalidad moral. **Porque antes que ninguna otra cosa, es la democracia una fuerza moral, y su moral radica precisamente en el reconocimiento que hace de la dignidad del ser humano, del alto respeto que esa dignidad merita y la responsabilidad en consecuencia que tiene todo el orden constitucional de descansar en ella, protegerla y defenderla.** Por eso en nuestra primera disposición además de sentar inicialmente esta base de la igualdad profunda del ser humano—igualdad que trasciende cualquier

Es decir, ésta cláusula constitucional sirve como *piedra angular* de nuestro ordenamiento constitucional, el cual debe "descansar en ella, protegerla y defenderla". *Íd.* Por eso, -- necesariamente -- la inviolabilidad de la dignidad humana debe permear a través de toda la estructura jurídica y debe utilizarse para interpretar y construir la normativa del resto de las cláusulas de nuestra Carta de Derechos. Farinacci Fernós, *op. cit.*, pág. 31. Esto incluye, -- muy particularmente por su proximidad -- el remanente del Art. II, Sec. 1, de nuestra Máxima, *supra*, donde de forma diáfana se establece que, "[no] podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas". Véase, también, Farinacci Fernós, *op. cit.*, pág. 35. En ese sentido, es forzoso concluir que el discrimen violenta la dignidad de la persona. *Íd.*

**Sin embargo, y muy a pesar de lo anterior, esta Curia no ha dilucidado el potencial de la inviolabilidad de la dignidad humana como un derecho independiente.** Ramos González, *supra*; J.J. Álvarez González, *Contestación al discurso del profesor Carlos E. Ramos González*, Vol. X, Rev. Acad. Puer. de Juris. y Leg., 31-45 (2010). Por el contrario, la ha reducido a un derecho complementario de otros derechos

diferencia, bien sea diferencia biológica, bien sea diferencia ideológica, religiosa, política o cultural—por encima de tales diferencias está el ser humano en su profunda dignidad trascendente. Y por eso decimos que el sistema de leyes y el sistema de instrucción pública habrán ambos de encarnar estos principios válidos y eternos. (Énfasis suplido). 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico, págs. 1103 (ed. 1961).

fundamentales y tiende a aplicar en su lugar -- en ocasiones, forzadamente -- el derecho a la intimidad. *Íd*. Con esto, hemos relegado la oportunidad de desarrollar y aplicar en nuestra jurisdicción el derecho autóctono a la dignidad humana como un derecho independiente, abarcador, irrenunciable, no canjeable, que opere *ex propio vigore* y oponible ante el Estado y la sociedad. *Íd*.

Entendemos, como mencionamos anteriormente, que este caso al parecer gozaba de todas las características para rectificar el mencionado error. Lamentablemente, ese no fue el curso de acción que decidió seguir una mayoría de mis compañeros de estrado. Por ello, enérgicamente disentimos.

**En fin, no albergamos duda alguna de que estamos frente a un escenario más -- de los muchos que podemos identificar -- donde aparentemente las leyes, reglamentos, ordenanzas y/o costumbres que rigen nuestra vida como Pueblo no toman en cuenta la dignidad del ser humano.[8] Es momento, pues, que la Federación Puertorriqueña de Voleibol y su Presidente, el doctor César Trabanco, tomen nota de lo anterior.**

Ángel Colón Pérez
Juez Asociado

---

[8] Véase de manera análoga, Santiago Cruz, *op. cit.*